James S. CAREY, Plaintiff-Appellee-Cross Appellant,

v.

GREYHOUND BUS CO., INC., et al., Defendants-Appellants-Cross Appellees.

No. 73–3133.

United States Court of Appeals, Fifth Circuit.

Sept. 26, 1974.

C. Paul Barker, New Orleans, La., for Amalgamated Transit.

Martin F. Burns, Chicago, Ill., Wm. F. Kirsch, Jr., Maurice Wexler, Memphis, Tenn., Breard Snellings, New Orleans, La., for Greyhound Bus.

Steven R. Plotkin, New Orleans, La., for defendants-appellants.

Louis A. Gerdes, Jr., New Orleans, La., for plaintiff-appellee.

Before JONES, THORNBERRY and COLEMAN, Circuit Judges.

COLEMAN, Circuit Judge.

## STATEMENT OF FACTS

This suit was instituted by James S. Carey, appellee and cross-appellant, both individually and as a representative of a class of all others similarly situated, against Greyhound Lines Inc., Local 1174 Amalgamaged Transit Union, and Local 275 of the New Orleans Building Maintenance Union. The suit was brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, alleging racial discrimination in employment. Carey seeks an injunction preventing defendants from interfering with his rights to equal employment opportunities, a revised seniority system, back pay and attorney's fees.

## FACTS

The case was tried solely on stipulation of facts, exhibits, and memoranda.

Appellant Greyhound operates terminals in Mobile, Montgomery, New Orleans, and Baton Rouge, which constitute one seniority district for employment purposes. Within this district, Greyhound's terminal employees are grouped into two classes; class A consists of agents and class B of porters. All Greyhound employees in the district are represented by Local 1174, except that class B employees in New Orleans are represented by Local 275. Prior to 1964 a class B employee was not allowed to bid on a class A vacancy. In November of 1964, however, Greyhound unilaterally adopted the policy of allowing a class B employee to bid on a class A vacancy if it had not been bid on by a class A employee. Once hired into class A and thus coming within representation by Local 1174, the former class B employee's seniority is determined from the date he was hired into class A—not from the date he began working for Greyhound as a class B terminal employee. Former New Orleans class B employees who are awarded jobs in class A may retain their seniority in Local 275 for 90 days.

Plaintiff Carey began working for Greyhound in 1957 as a class B porter. For short intervals between 1966 and 1968 he held agent's positions (which are class A jobs), but each time was

"bumped" back to a class B job by a senior Local 1174 member. He has held a class A job from July 3, 1968, to the present, and maintains seniority with Local 1174 from July 3, 1968.

The District Court found that pre-Act discrimination existed, and that "a causal nexus exists between past discrimination on the part of Grehound and the seniority system clearly prejudicial to plaintiff". As relief, Judge Boyle enjoined the defendants from denying Carey his seniority computed from the date of his original employment with Greyhound. This resulted in substituting plant seniority for the present system of departmental or union seniority. The District Court also granted attorney's fees and special damages (which had been stipulated to be $8000 and $500 respectively) against the defendants in solido, and denied Carey's request for back pay. The three defendants filed notices of appeal, alleging that they had not violated Title VII. The plaintiff below then cross appealed, seeking a reversal of the District Court's dismissal of the class action and denial of back wages for himself and the class.

## ANALYSIS

Appellants Greyhound and Local 1174 appeal the District Court's decision that they are in violation of Title VII of the Civil Rights Act of 1964. Greyhound asserts that they are perfectly willing to recognize the date of employment as the appropriate seniority date but claim they are powerless to unilaterally change the agreements between themselves and two unions, both of which are certified by the National Labor Relations Board. They defend that they have opened bidding on class A vacancies to class B employees, and point out that if plaintiff had not passed up earlier opportunities to go from class B to class A, he would have been receiving the maximum wage in the express agent category by the time he filed his first complaint with EEOC.

*(1) Greyhound denies they are in violation of Title VII.*

■ There is no doubt that statistical evidence is accorded great weight in "practice or pattern" discrimination cases, Ochoa v. Monsanto Co., 5 Cir., 1973, 473 F.2d 318, citing Rowe v. General Motors, 5 Cir., 1972, 457 F.2d 348 and United States v. Jacksonville Terminal Co., 5 Cir., 1971, 451 F.2d 418, cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L. Ed.2d 815 (1972).

■ In the case at bar, between the year 1936 and the effective date of the Civil Rights Act of 1964, Greyhound in its New Orleans terminal hired whites exclusively into the more favorable class A positions while it hired blacks exclusively into the less favorable class B positions. However, pre-Act racial discrimination without post-Act effects does not establish a *per se* violation of Title VII, United States v. Jacksonville Terminal Co., *supra*.

■ Under the present seniority system, class B employees cannot compete against class A employees for the more favorable class A positions. A class B employee can only get a class A job when no class A employee bids on it. Once a class B employee obtains a class A job, his advancement in class A is impeded in that he loses the seniority acquired with Greyhound while in class B. His seniority runs only from the time he entered class A. When a causal nexus exists between the past discrimination and the challenged present condition of employment (not justified by some "business necessity" which itself complies with Title VII), the courts have held that the present condition violates Title VII. Peters v. Missouri-Pacific Railroad Co., 5 Cir., 1973, 483 F.2d 490. See also *Local 189, infra*.

■ The facts in the case *sub judice* are similar to those in Local 189, United Papermakers and Paperworkers v. United States, 5 Cir., 1969, 416 F.2d 980, cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970). There, jobs

were organized within "lines of progression", and until May, 1964, the Company segregated these lines of progression by race. Black Local 189–A had jurisdiction over the less desirable jobs, while white Local 189 had jurisdiction over all others. Promotion within each line was determined by seniority in the job slot below. Time worked in the mill did not count.

The lines of progression were merged in 1966, but the Company continued to award promotions according to job seniority. As a result, blacks had no seniority in bidding for formerly white jobs except as against each other and new white employees. The United States brought suit against the employer and unions to set aside job seniority in any form.

Writing in *Local 189*, Judge Wisdom held the fact that the present seniority system appears to be neutral did not prevent a finding that the system violates the Civil Rights Act of 1964 if the inevitable effect is to cut into the employee's present right not to be discriminated against. In correcting the seniority system so as to comply with the Civil Rights Act of 1964, the Court construed the Act to prohibit *future* awarding of vacant jobs on the basis of a seniority system that locks in prior racial classification. White incumbent workers, however, were not to be bumped out of present positions by blacks with greater plant seniority. The fact that the employer persisted in utilizing a seniority system that gave preference to whites (hired before the merger of formerly segregated progression lines) to determine priority for filling vacancies, after its racial implications became known to the employer, indicated to the Court that the practice was intended to deny full exercise of applicable rights and justified the Attorney General's enforcing the Civil Rights Act of 1964. The Court concluded that specific intent need not be proved. Intent can be inferred if the discriminatory practice continues after racial implications have become known.

Progression would still be job by job, but seniority would be determined by counting time in the mill rather than time in the job slot below.

See also:

*Local 189, United Papermakers & Paperworkers, supra,* where present seniority system, which gave priority to worker who had worked the longest in job slot below vacancy and which had been carried over from time when progression lines had been segregated, had effect of presently discriminating against employees on ground of race, present seniority system should be replaced. Under new system, no employee would have right to a job he could not perform properly and progression would still be job by job but seniority would be determined by counting time in the mill rather than time in job slot below vacancy.

United States v. Jacksonville Terminal, *supra.* When seniority systems in use usually began when the employee started work in the craft and class to which he was regularly assigned; prohibited interclass transfers within a single craft; and in a technical sense locked all employees, black and white, into certain categories, the Court described this as an unusually strong nexus between discriminatory pre-Act conduct and racially neutral post-Act activity. The Court ordered that in future bidding on vacant jobs outside the worker's class or craft, terminal (plant-wide) seniority would be used. Once awarded the job, a worker's seniority in the new job will be his oldest seniority date which he holds on any of the terminal's seniority rosters in effect at the time of the District Court's decree.

Rowe v. General Motors, *supra.* Where present promotion and transfer standards operated to "freeze in" past discrimination, present conditions violate Title VII.

As in *Local 189*, the pre-Act discrimination and the seniority system in use here combine to hinder advancement by

many blacks in defendant's terminal. The District Court is affirmed on this point.

### (2) The Problem of Two Unions.

The employees in the New Orleans Greyhound Terminal are represented either by Local 275 or Division 1174. Class A, which is primarily composed of agents, is represented by Division 1174. Class B, composed of manual laborers, is represented by Local 275. Both unions belong to separate Internationals, and both are certified by the National Labor Relations Board. Greyhound asserts that it has no objection to the establishment of a common seniority date, but that because two certified NLRB bargaining units are involved, it has no authority to unilaterally effectuate this change.

Until July 3, 1968, Carey was a class B employee for Greyhound in New Orleans, and as such was represented by Local 275. Defendant Local 1174 asserts that it owed Carey no duty while he was a member of another union and contends it would have been a breach of their duty to the other employees they represent to have allowed Carey credit for past service with Greyhound before he came into their bargaining unit. Local 1174 denies that they have ever discriminated against non-whites and alleges that the difference in computing seniority in New Orleans exists as a result of another union representing class B employees, not because of racial discrimination.

The determining issue here is not whether the unions or Greyhound intended to discriminate against Carey and those employees who were at one time in class B. Congress directed the thrust of the Civil Rights Act of 1964 to the *consequences* of employment practices, not simply the motivation, Griggs v. Duke Power Co., 401 U.S. 424, 91 S. Ct. 849, 28 L.Ed.2d 158 (1971).

In addition, union contracts grant no immunity on the subject of racial discrimination. Neither can the employer use the union or unions for a shield. When necessary to insure full compliance with Title VII, a District Court is empowered to eliminate the present effects of past discrimination, Long v. Georgia Kraft, 5 Cir., 1972, 455 F.2d 331. Writing in Peters v. Missouri-Pacific Railroad Co., *supra,* Judge Godbold said:

> "Even if the railroad's intent in agreeing to and enforcing the challenged employment agreement was a racially neutral, or even benevolent, desire to discharge its legal duty to bargain with the plaintiffs' representative and to enforce the contract entered into, such intent does not save the agreement from the terms of Title VII if it operates to 'freeze' the status quo of prior discriminatory employment practices."

Plaintiff Carey does not have to prove that either or both of the unions discriminated against black employees. All that need be shown is that the employer discriminated against black employees prior to the passage of the Act and that the present system perpetuates that discrimination. When the employer or union has discriminated in the past, and its present policies renew or exaggerate that discrimination, those policies must yield unless there is an overriding legitimate, non-racial purpose, *Local 189, supra.* The Civil Rights Act of 1964 imposes on employers—with the assistance and cooperation of labor representatives—an affirmative duty to devise and implement pertinent, objective criteria for determining which applicants for promotion or transfer are qualified to fill particular vacancies, United States v. Jacksonville Terminal Co., *supra.* As parties to this action, the Unions must accommodate themselves to revisions in their contracts, rules and regulations, necessary to assure compliance with the Act.

### (3) Carey passed up earlier opportunities to enter class A.

Greyhound's final point on appeal is that Carey passed up earlier op-

portunities to leave his class B job and secure a position within class A. It points out that had Carey bid on a certain class A job which was available in 1966, he could have had it for the asking because the class B employee who eventually got it, one David Cantrelle, had less class B seniority than did Carey. If Carey had taken this job, which would have required transferring to Baton Rouge, Greyhound alleges he would have been receiving top pay in the express agent category by October, 1969, approximately six months prior to the date he filed his charge with the EEOC. Carey does not address this point in his brief.

This would seem to be irrelevant. It does not address the problem of previously segregated unions, the effect of which is evidenced today by a discriminatory seniority system. Appellant Carey might point out that if he had had the benefit of plant seniority in 1966, he would not have been "bumped" from the agent position he held for two months during that year. Carey and those like him can best be made competitive by affirming the District Court's order requiring plant seniority.

### (4) Back Pay.

The District Judge in the present case did not allow the plaintiff back pay against Greyhound because of what he felt was a good faith belief by Greyhound that it was bound by the collective bargaining agreements with the two unions involved. Back pay against the unions was also denied because the Court felt they had acted in good faith according to what they believed their obligations were under the NLRA.

Several recent Fifth Circuit cases have dealt with the issue of back pay. In Johnson v. Goodyear Tire & Rubber Co., 5 Cir., 1974, 491 F.2d 1364, Judge Gewin wrote that an employer's good faith and efforts to remedy past discriminatory practices were not a defense to a claim for back pay—" . . . back pay awards are not designed to punish the employer but to economically

elevate the victims to the status which is rightfully theirs".

In Pettway v. American Cast Iron Pipe Co., 5 Cir., 1974, 494 F.2d 211, good faith was again rejected as a defense to a claim for back pay. Judge Tuttle viewed back pay as "an integral part of the whole relief which seeks, not to punish the [employer], but to compensate the victim of discrimination". After considering the "rightful place" doctrine adopted by the courts and the Congressional purpose in adopting Title VII, Pettway holds that the scope of a court's discretion to deny back pay is narrow. "Once a court has determined that a plaintiff or complaining class has sustained economic loss from a discriminatory employment practice, back pay should normally be awarded unless special circumstances are present."

The following excerpt from Pettway illustrates the type "special circumstances" Judge Tuttle had in mind:

"The 'special circumstances' where an unjust result has prevented an award of back pay have been narrow. The most numerous are sex discrimination suits where conflicting state legislation, which limit work hours or impose weight lifting limits or the like for women employees, require a practice in violation of Title VII. In these cases the courts have properly declined to award back pay because 'state statutes, like federal ones, are entitled to the presumption of constitutionality until their invalidity is judicially declared.' Davies Warehouse Co. v. Bowles, 321 U.S. 144, 153, 64 S.Ct. 474, 479, 88 L.Ed. 635 (1944). However, a back pay decree is appropriate in those cases where a limitation is not imposed by a state statute but by the employer, or where the employer is put on notice of a judicial or definitive administrative determination of the invalidity of the state law."

At p. 254.

In Baxter v. Savannah Sugar Refining Corp., 5 Cir., 1974, 495 F.2d 437, we held that good faith was not a defense

to an action for class-wide back pay, re-affirming *Johnson* and *Pettway, supra.*

Because the decision to deny back pay was based on the good faith of Greyhound and the unions, the preceding cases appear to mandate a reversal on this point. We remand for judicial determination of the amount of back pay due Carey and that liability, once ascertained, should be jointly assessed against Greyhound and the two unions, as were the attorney's fees and expenses. A union's role as a party to a collective bargaining agreement can be legally sufficient to impose back pay liability on the union if the agreement violates Title VII, Guerra v. Manchester Terminal Corporation, 5 Cir., 1974, 498 F.2d 641.

In Johnson v. Goodyear, *supra,* a panel of this Court upheld an award of back pay against a union that had impermissibly restricted black employees to the labor department by being a party to a collective agreement that imposed departmental seniority. There can be no question here that Division 1174 is patently *guilty of an identical violation.* We find that the conduct of Local 275, though disguised by a thin veneer of racial neutrality, is equally untenable. Local 275 could not, of course, negotiate directly with Greyhound concerning the job security of the class A employees represented by Division 1174. Nevertheless, at some point Local 275 could have taken the affirmative step to initiate negotiations with Greyhound in an effort to salvage for its own ex-members the seniority they would inevitably and foreseeably lose upon being "bumped" from Division 1174 after ninety days in a class A job. While such a step might have proved unavailing, it would have constituted at least a concerned attempt by Local 275 to soften a blow over which the "bumped" employee had no control. Furthermore, it would have constituted an assertion of the "bumped" employee's right to bid for the next class A job opening—a right he might have fruitfully exercised had Local 275 actively sought plant seniority for its members, irrespective of the seniority scheme perpetuated by Greyhound and Division 1174. We therefore conclude that the ineffectual passivism manifested by Local 275 in its relations with Greyhound served to facilitate the continuing pattern of racial job discrimination at the New Orleans terminal, and we hold that this facilitation violated plaintiff Carey's right to equal employment opportunity as guaranteed by Title VII. *Cf.* Note, Title VII, Seniority Discrimination, and the Incumbent Negro, 80 Harv.L.Rev. 1260, 1278 (1967).

In this case, all parties seem to be equally guilty—or guiltless. Greyhound was agreeable to substituting plant seniority but felt it could not do so unilaterally. The unions apparently were acting under what they thought their obligations were under the NLRA. In addition, Division 1174 felt it would be breaching its duty to its other members to allow Carey any additional seniority.

Any award of back pay would apply only to the period of employment after the effective date of Title VII of the Civil Rights Act of 1964, or the statute of limitations, whichever later attached, *Pettway, supra,* 494 F.2d at 258.

### (5) Class Action.

The District Court granted appellee Greyhound's motion to strike the class action, wherein the plaintiff asserted a right to represent black employees similarly situated at Greyhound Lines' New Orleans terminal. Greyhound supported its motion to dismiss the class action by demonstrating that the size of the proposed class was 28 and that all members of the class lived in New Orleans or its immediate vicinity. The figure 28 was arrived at by counting the number of blacks *presently employed* who were originally hired into Local 275, regardless of whether they were still in Local 275 or had since become members of Division 1174.

Appellant Carey contends that Greyhound incorrectly computed the size of the class by not counting the black employees who quit working for Greyhound

after July 2, 1965, the effective date of the Civil Rights Act of 1964. Carey contends the size of the class should be at least 81 and arrives at that figure by adding the 50 blacks who have been hired since July 2, 1965, to the 31 blacks who were hired prior to July 2, 1965, and worked during some time after that date. The difference in the two figures arises because Carey counts some blacks who are no longer employed by Greyhound.

In dismissing the class action, District Judge Boyle did not say what size he found the class to be. His opinion simply states that the class action was denied. A district court's determination of existence of a proper class, at least with respect to size, is considered final unless abuse is shown. Hill v. American Airlines, 5 Cir., 1973, 479 F.2d 1057. In addition, the trial court's detailed knowledge of the facts places it in as favorable a position as possible to judge whether joinder is impracticable. Therefore, it is the general rule that the trial court's decision on this issue is final unless there is an abuse of discretion, or the trial court has applied impermissible legal criteria or standards, Cypress v. Newport News General & Nonsectarian Hospital, 4 Cir., 1967, 375 F.2d 648; Matthies v. Seymour Manufacturing Company, 2 Cir., 1959, 270 F.2d 365. See, also, 3B Moore's Federal Practice § 23.05. However, these cases must be balanced with the nature and intent of the Civil Rights Act, whose purpose is to provide a broad remedy for all who fit the plaintiff's class.

Writing in Johnson v. Goodyear, *supra*, Judge Gewin said:

"Our court has never been confronted with the precise issue of whether a district court should award class-wide back pay, where the class establishes a prima facie case of employment discrimination. It is obvious to us that where employment discrimination has been clearly demonstrated. employees who have been victims of that discrimination must be compensated if financial loss can be established. Title VII racial discrimination claims present an appropriate area in which to require class-wide back pay. The individual discriminatee has been locked into his undercompensated position precisely because he is a member of an unfavored class. To implement the purposes behind Title VII, a court should give 'a wide scope to the act in order to remedy, as much as possible, the plight of persons who have suffered from discrimination in employment opportunities.'

"Our holding does not necessarily mean that every member of the class is entitled to back pay. Individual circumstances vary and not all members of the class are automatically entitled to recovery. There should be a separate determination on an individual basis as to who is entitled to recovery and the amount of such recovery. It is clear that all members of the class have been subject to unlawful racial discriminatory practices. Therefore, those who have suffered a loss of pay because of such practices are entitled to appropriate compensation. It is our understanding that approximately 14 members of the class are in substantially the same circumstances as employee Johnson. There are approximately 35 additional employees, making a total of about 50, who were the victims of racially discriminatory practices."

Writing in a similar situation, Judge Brown wrote:

"Indeed, if class-wide relief were not afforded expressly in any injunction or declaratory order issued in Employee's behalf, the result would be the incongruous one of the Court—a Federal Court, no less—itself being the instrument of racial discrimination, which brings to mind our rejection of like arguments and result in Potts v. Flax, 5 Cir., 1963, 313 F.2d 284, 289."

Jenkins v. United Gas Corporation, 5 Cir., 1968, 400 F.2d 28.

Defendant's only challenge to the class action is that all members (they still assume the number to be 28) of the class are in or around New Orleans, and hence it is not impracticable to join them as parties to this suit.

In Forbush v. Wallace, 341 F.Supp. 217 (M.D.Ala., 1971), affirmed, 405 U.S. 970, 92 S.Ct. 1197, 31 L.Ed.2d 246, the Court said:

"It has become well established in our law that 'impracticability' as used in Rule 23 does not mean 'impossibility,' but rather it refers to the difficulty or inconvenience of joining all members of the class. Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909, 913–914, (9th Cir., 1964); Union Pacific Railroad Co. v. Woodahl, 308 F.Supp. 1002, 1008 (D.Mont., 1970). It appears that the question of whether a number is so large as to make joinder impracticable is dependent not upon any arbitrary limit but rather upon the circumstances surrounding the case. 3B Moore's Federal Practice ¶ 23.05, at 277–78 (2d ed., 1969)."

Accordingly, the dismissal of the class action will be vacated and the cause remanded to the District Court for further consideration under the standards outlined in *Johnson* and *Pettway, supra*. Particular attention will be given to the size of the class and practicality of joinder.

As appellant, Carey also seeks to have provisions of the collective bargaining agreement declared discriminatory and defendants enjoined from applying them. If the class action is allowed, this question becomes moot. If the class action is denied, plaintiff's point would be well taken, and he should be afforded the abolition of the system—not just the prevention of its applicability to him.

In the final issue raised by Carey, he seeks to enjoin Greyhound from what he alleges to be discriminatory hiring practices. He points out that the District Court found Greyhound had hired 12 whites in class A positions (11 of whom were temporary employees) while hiring no blacks.

We are inclined to agree with Judge Boyle that this is irrelevant to plaintiff's attack on the present seniority system. Since July 2, 1965, Greyhound has hired 48 blacks and 30 whites in class B jobs. Though not hiring any new blacks into class A jobs between July 2, 1965, and the end of 1971, Greyhound did transfer 22 employees—17 blacks and 5 whites—from class B to class A jobs. There is no information in the record which reveals how many people, or what their races were, who applied for the above mentioned jobs. In the present posture of the case, we take no further notice of this issue.

By way of summary,

The Judgment of the District Court as to the existence of racial discrimination is affirmed.

The award of attorney's fees and special damages is affirmed.

The Judgment of the District Court requiring plant seniority is affirmed.

The Judgment as to back pay for Carey is reversed and remanded for further proceedings not inconsistent herewith.

The Judgment as to the class action aspects of the case is likewise vacated and remanded.