EQUAL EMPLOYMENT OPPORTUNITY COMMISSION et al., Plaintiffs-Appellees,

v.

UNITED AIR LINES, INC., et al., Defendants-Appellants.

No. 76–1769.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 13, 1977.

Decided June 28, 1977.

As Modified on Denial of Rehearing Aug. 9, 1977.

Sheldon M. Charone, Henry F. Field, Chicago, Ill., Plato Papps, Washington, D. C., for defendants-appellants.

Samuel K. Skinner, U. S. Atty., James W. Gladden, Jr., Chicago, Ill., Wyatt Johnson, Gulf Breeze, Fla., Gerald D. Letwin, Washington, D. C., for plaintiffs-appellees.

Before CUMMINGS, PELL and BAUER, Circuit Judges.

CUMMINGS, Circuit Judge.

In 1973, the United States, through the Attorney General,[1] filed a complaint under Section 707 of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e–6 (Supp. V 1975)), against United Air Lines, Inc. (United), the International Association of Machinists (IAM), and four other labor unions having collective bargaining agreements with United. As amended in 1974, the complaint alleged that United violated Title VII by discriminating against minorities[2] and women in hiring and recruitment practices, assigning them to less desirable jobs, failing to promote them on the same basis as white male employees, and requiring employees to pass certain non job-related tests that contributed to the exclusion of a disproportionate number of minorities. The complaint also alleged that the collective bargaining agreements between the unions and United "contain provisions, including provisions for promotion, demotion, transfer and layoff based on job seniority, which discriminate against represented employees on the basis of race, national origin, and sex." These provisions in the IAM agreement assertedly required minorities and women to forfeit their accumulated seniority upon transfer to higher-paying IAM positions from which they had formerly been excluded. The Government sought injunctive relief and back pay.

On September 16, 1975, at the close of plaintiff's case, the district court orally denied the defendants' motion to dismiss except as to discrimination against Asian-Americans. In so ruling, the court stated that it disagreed with United's contention that a *prima facie* case could not be made out by the Government by using evidence with respect to statistical disparities between the mix of United's work force for various job classifications in the ten largest cities served by United and by using United States census statistics for those cities. Judge Will pointed out that in "large part, this is not true on all counts, stewardesses or flight attendants are apparently hired on a broader base, but generally speaking, I think you look at the area in which the hiring takes place, for a *prima facie* case, with respect to statistical demonstration of discrimination." The court also discounted United's suggestion that its job applications figures should be used because as the EEOC had pointed out, lack of applications may "simply be an indicia of the effectiveness" of discriminatory practices. The judge remarked that the Government had submitted evidence in addition to statistics in attempting to make a *prima facie* case of discrimination against blacks, Spanish-surnamed Americans and women, but that a *prima facie* case had not been made with respect to Asian-Americans. Viewing the evidence most favorably to the Government, as required on defendants' motion to dismiss, he concluded that the EEOC had made a *prima facie* case as to women and minorities. He found that the discriminations had occurred "pursuant to and consistent with * * * IAM contracts," so that defendant IAM was as much involved as United. In closing, he added that "IAM has at least gone along * * * if not proposed or promoted the idea" of the discriminations but that he would have "to wait and see all the evidence before [the Court] can have an opinion as to whether the IAM has participated in discrimination." (Tr. of Sept. 16, 1975.)

The district judge subsequently suggested that the parties seriously attempt to negotiate a settlement under close court supervision. Many conferences among counsel for United and the Government en-

---

1. Pursuant to Section 707(c) and (d) of Title VII (42 U.S.C. § 2000e–6(c) and (d) (Supp. V 1975)), the Equal Employment Opportunity Commission (EEOC) was substituted for the United States as plaintiff on April 1, 1974.

2. The minorities were defined in the complaint as blacks, Spanish-surnamed Americans and

Asian-Americans. The defendants' motion to dismiss as to discrimination against Asian-Americans was subsequently granted at the close of the Government's case at trial for lack of evidence; that ruling is not involved in this appeal.

sued.[3] On January 20, 1976, at an extensive in-chambers conference, all parties were represented when a draft consent decree was presented to the court. IAM objected to proposed changes in seniority provisions with respect to IAM jobs. Negotiations were resumed to resolve the IAM objections and an additional court conference took place on March 10. On April 13, 1976, a revised consent decree was presented to the court below. At the conference with the court, IAM presented an objection only to paragraph 2 of Section VII, which is not involved in this appeal. Since the district judge considered the IAM objection dropped by the end of the conference, April 30 was set for the entry of the consent decree. On that day, for the first time, counsel for IAM insisted that IAM seniority[4] be substituted for company-wide seniority in Paragraph 1 of Section VII of the decree. The basis for this objection was that it had "always been IAM's view, based on the fact that all of the Government's evidence related to employees who transferred from one IAM job to another, that the term 'company seniority' referred only to the total time employed by [United] in a job in one of the bargaining units represented by IAM. To make sure that our under-

standing was the same as [United's], a meeting was scheduled for April 26, 1976, during which [United] stated that their interpretation was that 'company seniority' meant total time employed by [United] irrespective of whether an employee worked in a unit represented by IAM. This raised a crucial question since IAM could not enter into a consent decree on that basis * *." (Opposition of IAM to Proposed Decree at 2.)[5]

Paragraph 1 of Section VII of the decree provides as follows:

"VII. SENIORITY[6]

1. All job classifications covered by the United-IAM Ramp and Stores, Food Services, Mechanic, Dispatchers and Guards Agreements, as well as those jobs covered by United's agreements with TWU and ALEA, shall henceforth be governed by company seniority for purposes of determining priorities in layoffs and recalls. Employees in promoted positions holding seniority under the Mechanic, Ramp and Stores, Food Services, Dispatcher and Guard Agreements or thereafter promoted to such positions shall, upon return to a position under one of the Agreements in which he holds seniority, be credited for the purposes of layoffs

---

3. Attorneys for IAM were informed of the dates and progress of the negotiations but chose not to participate at that time.

4. That is time spent in any IAM job but excluding any time spent in a non-IAM job.

5. IAM filed an "Opposition of IAM to Proposed Decree" dated April 29, 1976, on April 30, 1976. Judge Will was quite explicit in detailing his displeasure at this apparent *deus ex machina* objection:

"I am astonished because we have talked from day one about company-wide seniority, and not until this morning have I ever heard a suggestion of IAM seniority. Not once. Not once from the first day we talked about —and, I should tell you, if anybody had said to me on the first day that we want seniority within the ALPA members, or we want seniority within the IAM members, I would have said, who do you think you are. God's chosen people? What is the idea of coming in here and saying to me you are going to be entitled to discriminate against blacks if they don't happen to be IAM members, or ALPA members.

---

* * * * * *

"You can appeal, if you like, and I can't stop you, but for you to tell the Court of Appeals that you were surprised, if you tell them that, it will be a falsehood. Nobody could be surprised about this subject. It was discussed and discussed, and discussed, and I was the one who started talking about company-wide seniority." (April 30, 1976, Tr. 5, 10.)

6. In general, Section VII of the decree was aimed at three separate goals: 1) encouraging transfers to higher-paying IAM positions by removal of the loss of seniority deterrent; 2) protecting minorities and females from layoff who had entered at low job levels and then moved up to higher job classifications because they were discriminatorily excluded from the higher positions in the past; and 3) adjusting the job classification seniority for all purposes of present ramp servicemen, storekeepers or mechanics who could individually prove being held back by a test result, educational requirement or other specific evidence of job discrimination.

and recalls with a company seniority date equivalent to the seniority they held while in the promoted position pursuant to the seniority provisions of the collective bargaining agreements."

Judge Will responded as follows after the IAM presented its objection to the use of company seniority in the foregoing portion of the decree:

"I talked about company seniority because it seemed to me that United, rightly, ought to recognize length of service as a consideration in layoff and that it was outrageous to take somebody who had been with them for 25 years, and because they had moved from one position to another within the last two, three, four years, say you're junior to somebody who has been with us four years, or five years, whatever it is, and therefore you get laid off notwithstanding your 25 years of service, and I don't care whether you are a union member or nonunion member. It seems to me the whole concept of recognition of length of service as a factor in layoff, makes it inescapable it is not going to be union seniority, whatever the union may be, or unorganized employee seniority. That it is going to be what we have talked about, all along, company seniority.

\* \* \* \* \* \*

"What we were going to correct was the inequities resulting from a historic pattern of alleged discrimination in job assignment, and promotion, and hiring. We were going to correct that by giving company-wide seniority so that seniority in grade was not going to be the criterion in terms of layoff, but seniority, company-wide, would be a factor at least to be taken into consideration in layoff.

\* \* \* \* \* \*

"The whole theory of the company-wide seniority was there was company-wide discrimination; therefore, in order to redress that, you had to get company-wide seniority. So that the fact that you were a black, and didn't get moved from the counter to something else, didn't prohibit you from staying on the job when, as, and if there was a layoff because some white who was there originally was hired for a higher job, or was promoted earlier, had longer seniority in grade, in job.

"The whole proof in the case was that at various levels, union and non-union, blacks had been deterred in job assignments and job promotion, and therefore, you had to do something, even though they had worked for United for a long period of time, you had to do something to give them some standing based on overall tenure, or service, and not just service in grade.

\* \* \* \* \* \*

"We are talking about company-wide seniority because that is the only way to deal with previous discriminations, whether or not they are within the IAM unit, or whether or not they were out of the IAM unit. That is the only reason we are talking about that." (April 30, 1976, Tr. 10–11, 13, 16–17, 24.)

At the close of the April 30 hearing, the district court entered the decree but in view of IAM's objection crossed out the word "CONSENT" on the first page.[7] Jurisdiction was retained for the purpose of modifications.

IAM's main protest against paragraph 1 of Section VII of the decree is that it destroys IAM seniority and permits company seniority to be used in determining priorities in layoffs and recalls. IAM contends that IAM "job classification security" should have continued. It urges that the decree should provide "for the continual use of IAM job classification seniority for all purposes except for seniority adjustments to place employees in their rightful place

7. IAM did not ask for an opportunity to resume trial or in any other way to produce evidence to rebut the Government's *prima facie* case to support its objection to the decree (Tr. April 30, 1976). Therefore, Judge Will's decision with respect to the Union was an adjudicated decision on the merits and not a mere consent decree. However, the decision remains a consent decree vis-à-vis United.

and [except] for restoration of seniority to permit employees to avoid layoffs by returning to jobs previously worked" (Br. 35). We disagree and therefore affirm.

IAM represents the largest number of United's unionized employees. As of May 31, 1973, it represented 18,382 United employees, including 7,400 mechanics, 3,600 ramp servicemen, 790 storekeepers, 1,200 food service assistants and 1,300 airplane cleaners. Under IAM contracts with United, seniority was measured from the date of entry into a given job classification rather than time served with United. Thus employees who transferred from one IAM basic job classification to another originally lost their seniority for all purposes except vacation. Sometime later they were permitted to maintain seniority in their former positions until a 90-day probation period was completed in their new jobs. This period was extended to one year in 1970 and to two years in 1973. Moreover, non-union employees transferring to an IAM job would retain no seniority. However, employees who transferred between non-union positions retained their company seniority for purposes of layoff and recall. IAM seniority governs layoff, recall and shift assignments as to IAM jobs as well as access to premium jobs within a given basic job classification.[8] At least five minority witnesses testified that they were unwilling to risk transferring to high-paying IAM positions unless they could retain their seniority.[9] Therefore, if IAM's contention as to using IAM job classification seniority in paragraph 1 of Section VII of the decree were sustained, minorities and females in non-union jobs and lower-paying IAM jobs would be deterred from transferring into higher-paying IAM jobs and would also be more susceptible to layoff if they did transfer belatedly. This is impermissible. *United States v. Bethlehem Steel Corp.,* 446 F.2d 652, 660 (2d Cir. 1971).

In considering whether company seniority was properly imposed rather than job seniority to govern layoff and recall of employees in IAM jobs, it must be recalled that a district court has wide discretion to fashion relief that will eliminate the vestiges of past discrimination. *United States v. United Brotherhood of Carpenters,* 457 F.2d 210, 216 (7th Cir. 1972); *Bowe v. Colgate-Palmolive Co.,* 416 F.2d 711, 721 (7th Cir. 1969). "In shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow." *Lemon v. Kurtzman,* 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (Burger, C. J., plurality). "[P]rincipled application of standards consistent with [the] purposes of [Title VII]" is required, but only a "regime of discretion that 'produce[s] different results for breaches of duty in situations that cannot be differentiated in policy'" (*Albemarle Paper Co. v. Moody,* 422 U.S. 405, 417, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280) needs to be eschewed. Indeed, in *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 779 n. 41, 96 S.Ct. 1251, 1271, 47 L.Ed.2d 444 the very "holding [was] that in exercising their equitable powers, district courts should take as their starting point the presumption in favor of rightful place seniority relief, and proceed with further legal analysis from that point; and that such relief may not be denied on the abstract basis of adverse impact upon interests of other employees but rather only on the basis of unusual adverse impact arising from facts and circumstances that would not be generally found in Title VII cases."

IAM argues that paragraph 1 of Section VII of the decree is unnecessary because seniority adjustments ordered in the decree (paragraphs 3–7 of Section VII) will suffice. However, those adjustments generally occur only if the identifiable employees discri-

---

8. Affiliated with certain basic jobs are "premium" higher-paying classifications such as "lead" ramp serviceman and "lead" storekeeper. A premium vacancy is awarded to the bidder with the most seniority in the basic job classification who has the ability to perform the premium job.

9. They are Vallerie McCloud, Willie F. Johnson, David Otero, Richard Melvin Breaux, and Reid Willis.

minated against can individually prove that they previously applied, sought to apply, or were dissuaded from applying for the positions in question and were qualified for the job at such time (paragraphs 3, 4(b) and 5 of Section VII.) As the EEOC aptly summarizes: "Females not assigned initially to IAM jobs and minorities who previously did not apply for the higher paying jobs generally will not be entitled to seniority adjustments under the decree" (Br. 26).

■ The record shows that females have been excluded from mechanic positions since World War II, were excluded from ramp service positions until at least 1971 and were excluded from storekeeper positions (with minuscule exceptions) until 1973. Only women in lesser jobs who had previously applied for or sought transfer to those higher-paying jobs will get seniority adjustments under Section VII of the decree. In view of the discriminations against women then being practiced and the forfeiture of seniority upon transfer, few, if any, would have expressed to desire to transfer, so that they will not receive seniority adjustments despite their having been victims of discrimination. The failure of an individual to apply for a position from which he reasonably could believe that he would be discriminatorily excluded does not defeat his claim for relief. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 363–369, 97 S.Ct. 1843, 52 L.Ed.2d 396; *Equal Employment Opportunity Commission v. American Telephone and Telegraph Company* 556 F.2d 167 (3rd Cir. 1977); *Bing v. Roadway Express, Inc.,* 485 F.2d 441, 451 (5th Cir. 1973); *United States v. Bethlehem Steel Corp.,* 446 F.2d 652, 660 (2d Cir. 1971); *Hairston v. McLean Trucking Co.,* 520 F.2d 226, 231–232 (4th Cir. 1975). It is true that many minority males applied for higher-paying jobs and thus will get seniority adjustments under Section VII of the decree. However, others would not have futilely applied because of then necessary requirements of high school diplomas and a passing grade on the Otis test (general intelligence) or forfeiture of seniority upon transfer.[10] Thus many males will also not receive adjusted seniority upon transfer.

■ From the foregoing, it is apparent that many discriminatees will not receive seniority adjustments under paragraphs 3–7 of Section VII of the decree.[11] Because adjusted seniority under the decree does not afford a remedy for all minorities and females, the district court was entitled to select company seniority for layoff and recall as the mechanism to provide redress to those many individuals in the female and minority groups who would not receive adjusted seniority under paragraphs 3–7 of Section VII. It would be unfair to confine the relief to those who can obtain adjusted seniority under the decree, preventing other worthy individuals from getting out of the low-paying jobs to which they were initially and discriminatorily assigned. *United States v. Bethlehem Steel Corp.,* 446 F.2d 652, 660 (2d Cir. 1971). This minor inroad[12] on the prior collective bargaining system in effect between United and IAM is appropriate to alleviate the severe hardship caused to subjects of discrimination who cannot prove the specific facts necessary for the limited adjusted seniority under the decree. IAM seniority as advocated by the Union

10. After the Otis test and the high school diploma requirement were dropped in 1968 for ramp personnel, three times as many minorities were employed in ramp than had been employed in the previous year.

11. Since the entry of the decree, only approximately 18 minorities and 35 non-minorities have had their seniority adjusted by the decree Implementation Committee.

12. Only seniority with respect to layoff and recall is affected by the decree. Longevity pay, shift assignments and other incidents of seniority are not changed even for the individuals who can receive adjustment under the decree. Thus the Government points out that in some larger sense this is unfair even to those who receive recall and layoff seniority adjustments since in a "litigated" as opposed to a "consent" decree case they might have received company seniority for all purposes. *Local 189, United Papermakers v. United States,* 416 F.2d 980, 990 (5th Cir. 1969); *United States v. Navajo Freight Lines,* 525 F.2d 1318, 1326–1327 (9th Cir. 1975).

would fail to include employees who were discriminatorily assigned to non–IAM positions and thus invidiously deny them the same layoff and recall rights as IAM incumbents for whom total IAM seniority is generally equivalent to company seniority since present IAM members have generally always been in IAM jobs with United. This was explained by Judge Will when overruling IAM's objections to the decree (see excerpts from Judge Will's remarks of April 30, 1976, *supra* ).

■ However, since this case was argued, the Supreme Court's opinion in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396, has been handed down. It is now clear that in order for a nonapplicant to receive the traditional presumption that he would have been hired but for his employer's discriminatory conduct, he must demonstrate that he was a potential victim of unlawful discrimination. "Because he is necessarily claiming that he was deterred from applying for his job by the employer's discriminatory practices, his is the not always easy burden of proving that he would have applied for the job had it not been for those practices." *Teamsters, supra,* 431 U.S. at 367, 97 S.Ct. at 1871. "Resolution of the nonapplicant's claim * * * requires two distinct determinations: that he would have applied but for discrimination and that he would have been discriminatorily rejected had he applied." *Id.* at 368 n. 52, 97 S.Ct. at 1871.

■ As to the first prong, we begin with the pre-*Teamsters* law. Although IAM's counsel suggests that this is a case of first impression, our own Circuit has approved company seniority in *Waters v. Wisconsin Steel Works,* 502 F.2d 1309, 1318 (7th Cir. 1974). Similarly company seniority has been approved elsewhere. *E. g. Hairston v. McLean Trucking Co.,* 520 F.2d 226, 235 (4th Cir. 1975); *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 247–249 (5th Cir. 1974); *United States v. Bethlehem Steel Corp.,* 446 F.2d 652, 662–665 (2d Cir.

1971), and *Carey v. Greyhound Bus Co., Inc.,* 500 F.2d 1372, 1378 (5th Cir. 1974). The courts have long recognized that the failure of an individual to apply for a position from which he would be discriminatorily excluded does not defeat his claim. While only five employees testified that they were unwilling to transfer to higher paying IAM jobs because they would lose their seniority, that evidence is ample to support the company seniority imposed with respect to layoffs and recalls, especially since IAM admits that non-IAM represented employees had been discriminated against (Br. 31). As Judge Gibbons pointed out in *American Telephone and Telegraph Company, supra,*

"It will, for example, be nearly impossible to show that individuals were deterred from applying for hiring or promotion, or from attempting to meet the prerequisites for advancement, because of their well-founded belief that a particular employer would not deal fairly with members of their particular sex or racial group" (at 180).

In any event, Congress did not intend Title VII remedies to be available "only to those knowledgeable enough and militant enough to have demanded and been refused what was not available" (at 175).

*Teamsters* has vindicated this point of view as a theoretical matter while emphasizing the difficult proof problems of the nonapplicant. More precisely, *Teamsters'* newly enunciated first principle of Title VII law establishes that to "conclude that a person's failure to submit an application for a job does not inevitably and forever foreclose his entitlement to seniority relief under Title VII is a far cry * * * from holding that nonapplicants are always entitled to such relief." *Teamsters,* 431 U.S. at 367, 97 S.Ct. at 1871. "The known prospect of discriminatory rejection shows only that employees who wanted * * * jobs may have been deterred from applying for them. It does not show which of the nonapplicants actually wanted such jobs, or

which possessed the requisite qualifications."[13] *Id.*

Unlike the situation in *Teamsters,* the Government here need not "carry its burden of proof with respect to each specific individual." *Id.* at 371, 97 S.Ct. at 1873. This is because the "evidentiary gap" for this group is filled by a given nonapplicant's "current willingness to transfer into a * * * position[; it] confirms his past desire for the job." *Id.* In *Teamsters* a "willingness to accept the job security and bidding power afforded by retroactive seniority [for all purposes] says little about what choice an employee would have made had he previously been given the opportunity freely to choose [the job]." *Id.* Here, while a transferee to an IAM job will be given company seniority for purposes of layoff and recall, departmental seniority will continue for other competitive purposes. Thus an "employee who transfers into [an IAM] unit [will be] placed at the bottom of the seniority 'board.'" *Id.* at 371, 97 S.Ct. at 1872. Unlike the employees in *Teamsters,* the employees here are not given the option of transferring "on a silver platter." Rather, under the decree, a United employee would have to start from the bottom of the ladder as to all other conditions such as shift assignments, promotions to premium job classifications and longevity pay. Present willingness to start at the bottom of the departmental "board" says much "about what choice an employee would have made had he previously been given the opportunity freely to choose [the job]."[14]

■ This decree does not abrogate collective bargaining except to impose company seniority with respect to layoff and recall. As the trial judge rightly observed, such relief is necessary to correct inequities that had previously prevailed against the class members, for in the past employees had to forfeit accrued seniority if promoted to IAM jobs. Company seniority was necessarily imposed so that minorities and females in lower-paying jobs would no longer be deterred from seeking promotions to higher-paying IAM jobs. *Robinson v. Lorillard Corp.,* 444 F.2d 791, 796 (4th Cir. 1971). White male employees will not be unduly hurt since they too receive company seniority under Section VII, paragraph 1.[15] See generally Lopatka, A 1977 Primer on the Federal Regulation of Employment Discrimination, 1977 Ill.L.F. 69, 148–150. As seen, despite the adjustments provided in Section VII, paragraphs 3–7, females and minorities in lower-paying jobs would still be deterred from their movement upward if the prior IAM seniority system were still used with respect to layoffs and recalls. As then Chief Judge Swygert pointed out in *Waters v. Wisconsin Steel Works, supra,* 502 F.2d at 1320:

"Moreover, an employment seniority system is properly distinguished from job or department seniority systems for purposes of Title VII. Under the latter, continuing restrictions on transfer and promotion create unearned or artificial expectations of preference in favor of white workers when compared with black incumbents having an equal or greater length of service. Under the employ-

---

**13.** The qualifications for the various jobs is set by Section IV of the decree. Since United, as the employer, has consented to the decree, Section IV provides the definitive answer on job unit qualifications. Cf. *Teamsters, supra,* 431 U.S. at 369 n. 53, 97 S.Ct. 1843.

Since the employer has also consented to company seniority, layoff and recall seniority will not be a question of when a transferee became qualified for a job so long as he is qualified when he applies.

**14.** Although we find the present willingness to accept unit seniority handicaps, provided only that layoff and recall seniority is measured on a company basis, to be compelling on the past

desire to apply, we should also note that the low-paying job groups to which the minorities and women were disproportionately assigned are not "parallel" to the jobs from which they were excluded. *Teamsters, supra,* 431 U.S. at 369 n. 55, 97 S.Ct. 1843.

**15.** On appeal, IAM raises for the first time the theory that everyone laid off under company seniority who would have remained on the job if job classification seniority were used should be recompensed for lost work. Since this argument is non-jurisdictional, it may not be raised now. *United States v. Tyrrell,* 329 F.2d 341, 345 (7th Cir. 1964).

ment seniority system there is equal recognition of employment seniority which preserves only the earned expectations of long-service employees." [16]

 While IAM insists this relief illegally destroys collective bargaining rights, it is well settled that seniority systems in collective bargaining agreements may be modified to provide relief under Title VII. *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 778–779, 96 S.Ct. 1251, 47 L.Ed.2d 444; *Equal Employment Opportunity Commission v. American Telephone and Telegraph Company, supra,* 178–179; *United States v. International Union of Elevator Constructors,* 538 F.2d 1012 (3d Cir. 1976). However, *Teamsters* now requires that discrimination imposed after the effective date of the Civil Rights Act of 1964 cannot engender a remedy which grants retroactive seniority which antedates the Act. If a seniority system "did not have its genesis in racial discrimination * * * [and] was negotiated and has been maintained free from any illegal purpose," those "employees who suffered only pre-Act discrimination are not entitled to relief, and no person may be given retroactive seniority to a date earlier than the effective date of the Act." 431 U.S. 356, 97 S.Ct. 1865. The seniority system here is neutral on its face and Judge Will did not find a taint in its genesis or maintenance. Thus the teaching of *Teamsters* is directly applicable.

 Since employees who suffered only pre-Act discrimination may not have their seniority adjusted pre-Act, company seniority as used in the decree will henceforth mean either total tenure with the company after July 2, 1965 (the effective date of the Civil Rights Act of 1964), or total union seniority whichever is greater. *Teamsters* establishes "the legality of the seniority system insofar as it perpetuates post-Act discrimination" because "Section 703(h) on its face immunizes all bona fide seniority

systems, and does not distinguish between the perpetuation of pre-Act and post-Act discrimination." 431 U.S. at 348 n. 30, 97 S.Ct. at 1861. A casual reading of this footnote in *Teamsters* might suggest that company seniority could not extend even to persons who have suffered post-Act discrimination. However, the footnote must be understood in conjunction with the textual passage it supplements, namely, the following:

> "Post-Act discriminatees, however, may obtain full 'make whole' relief, including retroactive seniority under *Franks v. Bowman, supra,* without attacking the legality of the seniority system as applied to them. *Franks* made clear * * * that retroactive seniority may be awarded as relief from an employer's discriminatory hiring and assignment policies even if the seniority system agreement itself makes no provision for such relief. 424 U.S. at 778–779, 96 S.Ct. at 1271. Here the Government has proved that the company engaged in a post-Act pattern of discriminatory hiring, assignment, transfer, and promotion policies. Any [minority or woman] * * * injured by those policies may receive all appropriate relief as direct remedy for this discrimination."

*Id.* at 347, 97 S.Ct. at 1860.

For individuals who can demonstrate under Section VII paragraphs 3–7 of the decree that they previously applied, sought to apply, or were dissuaded from applying, the language of footnote 30 is plainly inapplicable. For this group, seniority may be computed as time with the company rather than with the union job unit so long as the seniority adjustment does not antedate the Act.

However, those employees who now transfer because post-Act discrimination dissuaded them from transferring to a cer-

---

16. *Teamsters* notes that "there is no reason to suppose that Congress intended in 1964 to extend less protection to legitimate departmental seniority systems than to plant-wide seniority systems." 431 U.S. at 355 n. 41, 97 S.Ct. 1864. However, once *Franks* direct remedy relief is indicated, 431 U.S. at 324, 97 S.Ct. 1843, Judge Swygert's language in *Waters* provides guidance on the location of the proper boundaries of the equitable relief. These words continue to legitimate the thrust of the decree below.

tain IAM job unit in the past pose a more difficult problem. The effect of footnote 30 on them is to permit company seniority if they apply for a transfer but not if they choose to remain in their present jobs. In this case, bargaining unit seniority still controls for all competitive purposes except layoff and recall. Cf. *Teamsters*, 431 U.S. 324, 97 S.Ct. 1843. As we have demonstrated above, employees who choose to transfer now and start at the bottom of the job unit board for competitive purposes have overleapt the evidentiary gap necessary for a "direct remedy" under *Franks*. But if an employee does not choose to transfer, no evidentiary presumption is available to put him on the same basis as individuals who can explicitly prove prior application and discriminatory refusal. For them any seniority adjustment in their layoff and recall rights would be a remedy for the discriminatory effects passively engendered by the bona fide seniority system. *Teamsters* forecloses this type of relief.[17]

As to the second prong of the *Teamsters* test, IAM claims the decree is overbroad because class members who were never actually held back by discrimination theoretically may transfer from a non–IAM position to an IAM position in order to obtain seniority for purposes of layoff.[18] These fears are highly speculative; indeed they border on the preposterous. Cf. *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453. It is difficult to comprehend why someone who was never held back by discrimination would now take an IAM position merely to have company seniority for layoff and recall in the new position when he would have to start from the bottom of the ladder as to all other conditions such as shift assignments, promotions to premium job classifications and longevity pay.

Moreover, the adjusted seniority system in the decree does not arbitrarily oust "insiders" in favor of "outsiders" who were not actually subject to discrimination. See *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 776–778, 96 S.Ct. 1251, 47 L.Ed.2d 444; *Patterson v. American Tobacco Co.*, 535 F.2d 257 (4th Cir. 1976). Rather one employee will be competing against another only on the basis of his earned expectations based on company service. Company seniority assures that incumbent employees will be protected from layoff on a fair basis. Speculative counter examples, such as IAM suggests, of a few non-class members benefiting from the decree are immaterial. See *United States v. Navajo Freight Lines*, 525 F.2d 1318, 1327 (9th Cir. 1975). Company seniority is a common denominator which treats all employees fairly regardless of past alleged discrimination.

*International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396, is an extraordinary case from the standpoint of *stare decisis*. In the words of Justice Marshall's dissent:

---

**17.** Thus a class member who transferred to an IAM position prior to the decree but not pre-Act would have to be content with union seniority since his relatively low layoff and recall seniority is caused by the passive operation of a bona fide seniority system which is perpetuating pre- and post-Act discrimination. However, because a new transferee starts with no departmental seniority, the previous transferee will always have superior departmental seniority even though his layoff seniority would be governed by his union time. Further, it would be possible that a previously transferred employee could be laid off first even though his time with the company is longer than the subsequent transferee under the decree since the previous transferee has shorter union seniority than the subsequent transferee's company seniority.

**18.** IAM poses the hypothetical of a supervisor with long company service who after working as a mechanic for one day will be able to protect himself against layoff on the basis of company seniority ahead of a black employee who has been a mechanic for a number of years but who has less company seniority.

The second sentence of Section VII, paragraph 1, provides an exception from company layoff and recall seniority with respect to promoted employees, including supervisors, as that term is used in the IAM agreement. Such promoted employees have only time spent in non-management jobs as their seniority for layoff, so that IAM wrongfully asserts that a former supervisor after working one day as a mechanic would have a preference over a black mechanic (Br. 19).

"As the Court also concedes, with a touch of understatement, 'the view that § 703(h) does not immunize seniority systems that perpetuate the effects of prior discrimination has much support.' *Ante,* at 1860, n. 28. Without a single dissent, six courts of appeals have so held in over 30 cases, and two other courts of appeals have indicated their agreement, also without dissent. In an unbroken line of cases, the EEOC has reached the same conclusion. And the overwhelming weight of scholarly opinion is in accord." *Id.* at 378, 97 S.Ct. at 1876.

Our view of *Teamsters'* effect on the decree below may create a remedy which is alien to the purposes and intent of the consenting parties. Otherwise the original decree, along with supplemental effectuating decrees, will suffice to fine-tune the remedy to conform to *Teamsters* and our opinion. But if the anomalies created by applying *Teamsters* to the factual predicate below fundamentally impair the vindication of the Title VII violation, Section XIII of the decree (see n. 19 of our opinion) empowers Judge Will to enter decrees which actually supersede his present decree.

The parties' mistake of law here is *sui generis.* When the Supreme Court hands down an opinion contrary to the universal holdings of a plethora of cases of the courts of appeals and the unbroken voices of the commentators, its decision still discloses the controlling law. But in such a unique case, the prior mistaken view of the law is more akin to a mistake of fact. In such a situation, the district court is free to fashion another remedy so long as that remedy is consistent both with *Teamsters* generally and with the gloss our opinion puts on the Supreme Court's opinion.

In the circumstances of this case, the district judge was warranted in using company seniority with respect to layoffs and recalls rather than IAM seniority for employees who wish to transfer between jobs. Therefore, the decree is affirmed as modified. Any forthcoming proceedings below must of course be consistent herewith.[19]

---

**19.** In Section XIII of the decree Judge Will retained jurisdiction "for the purpose of issuing any additional orders or decrees needed to effectuate, clarify or enforce the full purposes and intent hereof." Therefore, the parties already have a forum with respect to *Teamsters'* "bearing on particular aspects of the complicated scheme of relief awarded in this case." The June 20, 1977, motion of appellees for a remand is accordingly denied.

